# DUVALL v. PHILADELPHIA, BALTIMORE & WASHINGTON RAILROAD COMPANY.

---

RAILROADS; MASTER AND SERVANT; NEGLIGENCE; ASSUMPTION OF RISK; QUESTIONS FOR JURY.

Where a brakeman in the employ of a railroad company, having been ordered by his conductor to couple garbage cars on a bridge, the girders of which extended about 2 feet above the tracks on either side of the bridge, was caught between the moving cars and one of the girders, a space of about 11 inches, and injured, and it appeared that while prior to the accident no difficulty had been experienced in coupling ordinary cars on the bridge, the garbage cars were of wider and lower construction than ordinary cars, and none of the trainmen testifying, including the plaintiff, had ever coupled such cars on the bridge, it was *held* in an action by the brakeman against the

railroad company to recover damages for his injuries, that whether
the defendant had provided a reasonably safe place for the use of the
plaintiff, and whether the extra hazard to the plaintiff resulting
from the coupling of the garbage cars on the bridge was so open and
obvious as to charge the plaintiff with assuming the risk, were ques-
tions for the jury, and that it was error for the trial court to direct
a verdict for the defendant. (Mr. Justice VAN ORSDEL dissenting.)

No. 2723. Submitted January 7, 1915. Decided April 5, 1915.

HEARING on an appeal by the plaintiff from a judgment of
the Supreme Court of the District of Columbia, on a verdict
directed by the court, in an action to recover damages for per-
sonal injuries. *Reversed.*

The COURT in the opinion stated the facts as follows:

Appeal from a judgment upon a verdict for the defendant,
The Philadelphia, Baltimore, & Washington Railroad Com-
pany, appellee here, directed at the close of plaintiff's evidence,
in an action to recover damages for personal injuries sustained
June 18, 1912, while coupling cars on South Capitol. street
bridge, in this city. In its motion for a directed verdict, de-
fendant alleged assumption of risk by plaintiff, Harvey A.
Duvall, and no negligence by it.

In addition to his own testimony, plaintiff introduced as wit-
nesses the conductor in charge of the train and crew at the time
of the accident, the engineer in charge of the engine, his fire-
man and another brakeman, another freight conductor who was
present, and a man who made certain measurements which will
hereafter be noticed.

All the tracks of the defendant from the Potomac River to
the Capitol Hill tunnel are embraced within the yard limits.
Six tracks cross South Capitol street by means of a steel bridge
supported by girders which extend upward on both sides of
each track to the height of about 2 feet above the track. Prior
to the accident, whenever cars that were to be coupled or un-
coupled happened to stop on the bridge, it was the practice to

make the coupling where they stood, the conductor testifying "that in making the couplings the men go in to where the cars stand, and set the couplings, and they can then either stay inside between the girder and the cars, or come out on to one of the other tracks, or they might climb out on top of the girder; that the various tracks crossing the bridge were used from time to time by the engines and trains that might be shifting or passing over them; that at and before the time Duvall was injured men frequently stood (inside the girder) between the girder and the track on which the coupling was being made, and that the witness himself had done so; that at that time they had no idea they would get hurt, as nobody had been injured before; that since Duvall was injured the men do not remain inside the girder to see if the couplings are made."

Across the river in Virginia was a garbage plant, and this train crew handled the garbage cars every time they made a trip. From four to fourteen cars a day, filled with garbage, were taken from the garbage yard to the garbage plant. Formerly these garbage cars were hauled out of the garbage yard, and connected with other cars in the subway on the Navy Yard track. Some time before the accident, the plaintiff in his testimony fixing it as "probably a month or six weeks before," the practice was changed, and the garbage cars were hauled out of the garbage yard on to the "high line" or tracks above the level of the streets, and coupled at the rear of other cars on one of the tracks crossing the South Capitol street bridge.

The accident occurred at about 6:30 in the evening, and before sundown. Garbage cars had been pulled out of the garbage yard, backed on to one of the tracks crossing said South Capitol street bridge, and there connected or coupled to several box cars, the easterly one of which was a Pennsylvania car that stood on the bridge. The conductor directed the plaintiff to make the coupling at the place where the box car was standing. In pursuance to this order Duvall walked out on to the bridge on track No. 4, the box car standing on track No. 3. After looking at the coupling, and without getting inside the girder, that is, while standing on track No. 4, Duvall gave the proper signal

for the engine to back up the garbage cars for the coupling. In response to the signal they were backed up, but for some reason failed to couple. The conductor testified "that Duvall then go inside between the girder and track No. 3, set the knuckles (it being sometimes necessary for the knuckles to be taken hold of and set by the hands, as there is no other way to move the draw-head), and, standing inside the girder at the point where he was making the coupling, gave another signal meaning that the coupling was ready for the cars to come back; that when the cars were backed, in response to Duvall's signal that the coupling was ready, he was caught between the end of the garbage car and the girder and thrown across the girder," and seriously injured. The witness "did not apprehend any danger to Duvall from running the cars back." On cross-examination he testified that "it was not customary for the brakeman in doing the work which Duvall was doing to get on top of the girder; that there was nothing different in the way the coupling was made from what had been done there before;" that after setting the knuckles Duvall "moved back against the girder, standing right back against the girder facing the car," and gave the proper signal to back up; that the witness backed up to make the coupling, and "caught Duvall between the sill of the car (garbage car) and the girder." Another brakeman testified that he had made couplings standing between the car and the girder. The other conductor stated that "up to the time Duvall was hurt the men had not had any particular place to stand in making couplings on the bridge; that he had seen men stand inside the girder and had done so himself. * * * He could not say that when he saw Duvall go to make the coupling that he was getting into a dangerous place, as nobody had been injured before." While some of the Pennsylvania box cars were wider than the garbage cars, most box cars were narrower, and there was another important difference between the two classes of cars. The measurements showed that the height of the sill of the lowest box car from the rail was a little over 34 inches, *while the distance from the sill of the garbage cars to the rail was only 25 inches.* In other words, while the sill of the box cars would be several inches

above the top of the bridge girder, the sill of the garbage car would be lower than the top of the girder, *and it was but 11 inches from the outside of the garbage car to the girder.* Although Duvall had served as a brakeman, extra conductor, and conductor, for more than six years, and had coupled these garbage cars on many occasions, and was familiar with their general appearance, he had never coupled one of them on this bridge, testifying that "it was a new thing to bring slop cars around there and couple them at that point." Nor could any of the other witnesses say that they had ever previously seen a garbage car coupled on this bridge. The plaintiff further testified that as the garbage car came back the second time he caught hold of the cut-lever on the end of the car, which the brakeman works in connection with the coupling, and which raises and lowers the latch pin when the cars are uncoupled; that this "was a very common thing to do, and which very often releases it (the latch pin) and causes it to drop into its place, and make it unnecessary to jar the engine ahead; that the pin drops down if you shake it; that in doing so the end of the car caught" and injured him. He had made up or broken up trains on or near other similar bridges in the yard, but had never shifted any of the garbage cars on one of these bridges. He did not remember fixing a coupling standing on top of a girder, "because it was difficult to stand on top of the girders because of the bolt heads with which they are set full." Neither he nor any other member of the train crew had ever taken any particular notice of the difference between the width and construction of the box cars and the garbage cars.

*Mr. George C. Shinn, Mr. Claude W. Owen, Mr. Joseph W. Cox,* and *Mr. J. T. Sherier* for the appellant.

*Mr. Frederic D. McKenney, Mr. John S. Flannery, Mr. William Hitz,* and *Mr. G. B. Craighill* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

The declaration alleges that the defendant company negli-

gently failed to provide the plaintiff a reasonably safe place in
which to work; that while there was "a space sufficiently wide
for a person to stand with safety between said girder and a
passing car of usual and proper dimensions, in the performance
of his duties; * * * the said space was entirely inade-
quate, and became a dangerous and hazardous place in which
to work, whilst a car of unusual or improper width or construc-
tion should be passing." Certainly it cannot be said, as matter
of law, that the conditions on this bridge at the time of the acci-
dent constituted a safe place for the movements of a switchman
when coupling a garbage car to another car. It is said that the
plaintiff needlessly exposed himself to danger by remaining in-
side the girder, but such was the practice according to the testi-
mony of the witnesses. With trains passing and repassing on
the adjacent track, that would not have been a particularly safe
place to stand, and while he could have stood upon the girder,
that, according to the evidence, did not constitute a very secure
standing place. Moreover, no difficulty had been experienced
in the coupling of ordinary cars. The evidence tended to show
that it was the unusual construction and width of the garbage
car that caused the accident. The plaintiff was as much in the
line of his duty when he was doing the thing he had been di-
rected to do by his conductor and in the usual manner as was
the hostler who was fatally injured while sitting in the cab
window on an engine, as disclosed in *Texas & P. R. Co.* v. *Har-
vey,* 228 U. S. 319, 57 L. ed. 852, 33 Sup. Ct. Rep. 518. He
had experienced no difficulty in coupling ordinary cars in that
manner, and had received no notice that it was dangerous to
do so. There was no evidence that it was necessary to construct
these girders as they were constructed, but, if it be assumed·
that it was necessary so to construct them, it cannot be assumed
that it was necessary to couple garbage cars while standing on
the bridge. It therefore was for the jury to say whether the
defendant had performed the duty imposed upon it to provide
a reasonably safe place for the use of the switchmen in its
employ.

The more serious question with which we are confronted is

whether the width of the garbage car, the nearness to the rail
of that car, and the extra hazard to switchmen resulting there-
from, were so open and obvious that the plaintiff must be held
to have assumed the risk of injury.   The plaintiff, of course,
had the right to assume that the defendant had performed its
duty.   He had a right to assume that in constructing these
girders his own safety and that of the other switchmen would
be taken into consideration.   As stated by the court in *Texas
& P. R. Co.* v. *Swearingen,* 196 U. S. 62, 49 L. ed. 388, 25
Sup. Ct. Rep. 164, 17 Am. Neg. Rep. 422, he had a right "to
assume that the defendant company had used due care to pro-
vide a reasonably safe place for the doing by him of the work
for which he had been employed."   In that case the plaintiff,
a switchman, while riding on the side of a box car, was struck
by a scale box 19½ inches from the car.   This scale box was
the standard distance from the track.   The plaintiff knew it
was there, was an experienced brakeman, but testified that he
had paid no particular attention to its proximity to the track,
and that he did not know it was so near that it could not be
passed in the performance of his duties as a switchman without
danger.   The court sustained the judgment of the court of
appeals, saying:   "The dangerous contiguity of the scale box
to track No. 2, and the extra hazard to switchmen resulting
therefrom, was not so open and obvious on other than a close
inspection, as to justify taking from the jury the determina-
tion of the question whether there had been an assumption of
the risk."   In reaching this conclusion the court took into con-
sideration the testimony of the plaintiff "as to his actual want
of knowledge of the danger."   In *Gila Valley, G. & N. R. Co.*
v. *Hall,* 232 U. S. 94, 101, 58 L. ed. 521, 524, 34 Sup. Ct.
Rep. 229, the rule was again stated as follows:   "An employee
assumes the risk of dangers normally incident to the occupation
in which he voluntarily engages, so far as these are not at-
tributable to the employer's negligence.   But the employee has
a right to assume that his employer has exercised proper care
with respect to providing a safe place of work, and suitable and
safe appliances for the work, and is not to be treated as as-

suming the risk arising from a defect that is attributable to the
employer's negligence, until the employee becomes aware of
such defect, or unless it is so plainly observable that he may
be presumed to have known of it.   Moreover, in order to charge
an employee with the assumption of a risk attributable to a
defect due to the employer's negligence, it must appear not
only that he knew (or is presumed to have known) of the defect,
but that he knew that it endangered his safety; or else such
danger must have been so obvious that an ordinarily prudent
person under the circumstances would have appreciated it."

Not a member of the train crew in the present case, when
the engine and garbage cars were backing on to the bridge where
the plaintiff stood, inside the girder, realized that he was in a
position of danger, nor did he, according to his testimony.
While the testimony shows that some Pennsylvania box cars
were even wider than the garbage cars, it also shows that a
large percentage of box cars were narrower, enough narrower
that a man "was able to walk up and down with ease between
the edge of the girder and the side of the car."   But a still
more important difference existed by reason of the garbage
car being lower, so that, as the testimony showed, the bottom of
its sills was lower than the top of the girders.   It will be readily
appreciated, when once the attention is drawn to this point,
that the higher the car the less the danger of being crushed
between it and the girder; and, *vice versa,* the lower the car the
greater the danger.   The witness who testified as to measure-
ments he had made said "that the side of a box car, if extended,
would touch a man way up above his hips" while standing in-
side the girder.   A garbage car, being at least 9 inches lower,
would strike a man that much lower.   It probably was owing
to the height of ordinary cars that no one considered it dan-
gerous to stand inside the girders while coupling them.

But it is said the plaintiff handled these cars day after day,
and must be presumed to have known that they were wider and
lower, and that, being wider and lower, it would be dangerous
when coupling them to stand inside the girder, where he stood
in coupling other cars.   Substantially the same contentions were

unsuccessfully made in the *Swearingen Case,* 196 U. S. 51, 49 L. ed. 382, 25 Sup. Ct. Rep. 164, 17 Am. Neg. Rep. 422, where the circumstances were quite similar. Of course, every brakeman knew that cars varied in width, but neither the plaintiff nor anyone else, so far as the record discloses, had experienced any trouble in coupling cars other than garbage cars. In other words, width alone did not constitute the danger, as obviously the brakeman, given room to stand inside the girder, could, by slightly inclining his body backward, avoid being crushed. The mere width, then, of a garbage car, was not calculated particularly to attract plaintiff's attention. The danger arose, or at least it would be a question for the jury to determine whether it did not arise, from the fact that the car was wider and also lower than other cars, so that a man standing inside the girder would be likely to be struck. Can it be said that the difference between the construction of these garbage cars and the other cars was so obvious and its significance so apparent that an ordinarily prudent person, under the circumstances, would have appreciated both? In other words, can it be said that the plaintiff, in the circumstances of this case, should have known that the coupling of garbage cars on this bridge was more hazardous than the coupling of other cars? To reach such a conclusion we must arrogate to ourselves greater knowledge than that possessed by the experienced witnesses who, without exception, testified to the contrary. The plaintiff had a right to assume that the defendant company would not, without notice to him, attempt to couple cars on the bridge unless it could be accomplished without special danger, and we think it was for the jury to say whether the extra hazard to switchmen resulting from the coupling of these garbage cars on the bridge was so open and obvious as to charge the plaintiff with assuming the risk. Now that the accident has happened and all the facts are before us, it is easy enough to say that the dangerous condition should have been obvious to the plaintiff, but the question is, How did it look to him before the accident?

It follows from what we have said, that whether the plaintiff was guilty of contributory negligence, and, if so, the extent of

it, will be a question for the jury under proper instructions from the court.

Judgment reversed, with costs, and cause remanded.

*Reversed and remanded.*

Mr. Justice VAN ORSDEL dissenting:

I am forced to dissent from the opinion and judgment of the court. My associates have proceeded upon the assumption that plaintiff was required, in the performance of his duty in making the coupling, to occupy the space between the girder and the cars. There is not even an intimation in the evidence that any such duty was imposed upon him, but, as I shall show later, exactly the contrary is disclosed by the record. However, inasmuch as my associates have proceeded upon this theory, it can be readily shown that, even upon this false assumption, the case falls squarely within the doctrine of assumed risk.

In many of the States the common-law doctrine of assumed risk has been greatly modified by statute. But in the District of Columbia the common-law rule prevails. *Butler* v. *Frazee,* 211 U. S. 459, 53 L. ed. 281, 29 Sup. Ct. Rep. 136. What, then, is the duty of an employer as to furnishing his employee a safe place in which to work? The reciprocal duty of employer and employee is well stated by Mr. Justice Pitney in the latest utterance of the Supreme Court on this subject, as follows: "Some employments are necessarily frought with danger to the workman,—danger that must be and is confronted in the line of his duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair, and of the

risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them." *Seaboard Air Line R. Co.* v. *Horton,* 233 U. S. 492, 58 L. ed. 1062, L.R.A. 1915C, 1, 34 Sup. Ct. Rep. 635, Ann. Cas. 1915B, 475. In the same opinion it was held that the common-law rule of assumed risk was not changed by the employers' liability act, and that the negligence of the employer must be affirmatively established as a condition precedent to recovery in any case.

On any theory, therefore, plaintiff was required to show that defendant was negligent in permitting garbage cars to be coupled at the place where the accident occurred. The negligence of defendant is an affirmative fact, and the burden of establishing it is upon plaintiff. *Butler* v. *Frazee,* 25 App. D. C. 392. *Thompson-Starrett Co.* v. *Warren,* 38 App. D. C. 310. The rule is clearly stated in *Patton* v. *Texas & P. R. Co.* 179 U. S. 658, 45 L. ed. 361, 21 Sup. Ct. Rep. 275, as follows: "It is not sufficient for the employee to show that the employer may have been guilty of negligence,—the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain, and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible, and for some of which he is not, it is not for the jury to guess between these half a dozen causes, and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

The mere fact that a place may be dangerous does not imply negligence. Railroading at best is dangerous business. Coupling cars by the most approved methods is a dangerous occupation. A person, therefore, engaged in the business, is presumed to exercise care commensurate with the usual hazards of his

employment. Of course, plaintiff was engaged in the perform-
ance of his duty when injured, in that he was required to make
the coupling. But if it appears that he was not required to
occupy the position he did, and that a safe place was open to
him, of which he knew, or ought to have known, where the work
could be performed with equal efficiency, he was required, in
the exercise of reasonable care, to choose the safe position.
Before defendant can be charged with negligence, it must ap-
pear that the only place open to plaintiff in which to perform
the work assigned him was unsafe, and, even then, before plain-
tiff could recover it must appear that the danger was not rea-
sonably obvious. If it appears that defendant provided safe
appliances and a safe place to make the coupling, it discharged
its full duty toward plaintiff.

It is not contended that there was any temporary defect in
the bridge, tracks, or cars, or in the operation of the cars gen-
erally, which caused or contributed to the accident; but it is
claimed that the negligence of the company consisted in re-
quiring garbage cars to be coupled on the bridge. As to all
other cars the place was reasonably safe. Assuming, therefore,
that the girder was so constructed in relation to the garbage
cars as to render the space between dangerous, did plaintiff
assume the risk attendant upon the dangerous situation? The
rule of assumed risk is stated in *Butler* v. *Frazee,* 211 U. S.
459, 53 L. ed. 281, 29 Sup. Ct. Rep. 136, as follows: "One
who understands and appreciates the permanent conditions of
machinery, premises, and the like, and the danger which arises,
therefrom, or by the reasonable use of his senses, having in
view his age, intelligence, and experience, *ought* to have under-
stood and appreciated them, and voluntarily undertakes to work
under those conditions and to expose himself to those dangers,
cannot recover against his employer for the resulting injuries.
Upon that state of facts the law declares that he assumes the
risk."

Was the danger such that plaintiff, "by the reasonable use
of his senses, having in view his age, intelligence, and expe-
rience, ought to have understood and appreciated it?" It ap-

pears that at the time plaintiff was injured he was thirty-five years old. He had been in the employ of defendant company for seven years, engaged in handling, inspecting, switching, and coupling all sorts of cars in and about the yards. There were, during this period, from six or eight garbage cars a day handled in the yards. He had been accustomed to couple box cars on the bridge. He had not coupled garbage cars there, but he had coupled garbage cars elsewhere, and was accustomed to seeing them shifted back and forth across the bridge, and also standing on the bridge.

On the day of the accident, he was sent to make a coupling between two sections of a train at a point where a garbage car at the rear of the section of the train to which the engine was attached was to be coupled to the front box car of the rear section of the train. He testified that "Conductor Herring told him to make the coupling between the cars to some cars standing on track No. 3; that he walked up track No. 4, found the knuckles open on the car standing there, and waved the engine back standing in track No. 4 when the cars came together; that they did not couple, and that he had to get over the girder to track No. 3 to get between the cars, lift the lever, open the knuckle, and adjust the coupling; that when he had done that he backed against the girder and stood there; that he signaled for the engine to come back, and that it came back and the cars came together in front of him;  *  *  *  that in doing so the end of the car caught him and turned him around, and when it released him, he fell face across the girder," thus sustaining the injuries complained of. He also testified as to the situation at the time of the accident, "that he had been handling slop cars a number of years before he had been injured; that he was familiar with their appearance, but had no occasion to measure them or anything of that kind; that there was nothing at the time of the accident to interfere with his seeing what cars made up the train; he could see the box cars and the garbage cars; that it was plain daylight."

It was daylight, with plaintiff engaged in the performance of a duty "naturally incident to the occupation," in the full

possession of his senses, creating his own situation by signaling the engineer to move the train back, which was carefully done. Nothing short of stupidity, or a wilful neglect of duty, or a total disregard for his own safety, could account for any sane man standing in the position occupied by plaintiff, and permitting a slowly approaching car, which he himself had put in motion, to run him down. He was standing between the girder and the end box car. He knew as an experienced workman that the jar of the sections of the train coming together would create a slight backward movement of the cars. The short distance could have been covered by a step or two simultaneous with the slow movement of the train. He excuses himself with the statement that he did not know that the garbage car was wider than the box car. He had room to stand and work between the box car and the girder. Can greater carelessness be imagined than that he should fail to observe that the wider approaching garbage car extended almost to the girder? The niceties of distance in inches and fractions of an inch were not necessary to render the dangerous situation obvious to a person of ordinary intelligence. The fact that the beam of the garbage car may have been lower than the top of the girder, which seems most improbable, since the record discloses that the girder was only 25 inches high, is unimportant, except that, to an ordinarily intelligent observer, it would emphasize the impending danger.

But my associates rely chiefly upon the case of *Texas & P. R. Co.* v. *Swearingen*, 196 U. S. 51, 49 L. ed. 382, 25 Sup. Ct. Rep. 164, 17 Am. Neg. Rep. 422. It will be observed that the important facts in that case have escaped their attention. Since the law of that case can only be applied to this upon a similar state of facts, the statement of the court in that case becomes most interesting. There the injured party was a yard switchman; here he was a brakeman in the yards. There he had worked in the El Paso yards for seven days before the accident; here plaintiff had worked in and about the Washington yards and the point where the accident occurred for seven years. There the accident occurred at night; here it occurred in the

clear light of day. There the plaintiff was switching his first train on track No. 2, where the accident occurred; here plaintiff had switched and coupled cars in and around where the accident occurred for seven years. He testified "that the practice had prevailed of coupling or connecting cars where they stood, whether on or off the bridge, and he had made couplings of cars on the bridge before the time he was injured." There plaintiff, in the darkness of night, was hanging to the ladder at the side of a moving box car, with a lantern on his arm, looking in the opposite direction from the scale box, as it was his duty to do, watching for a signal from the yardmaster; here plaintiff, in the clear light of day, was looking toward a standing train waiting to be put in motion by him, and when the signal was given it was to slowly move toward him, presumably a distance of not more than two or three yards. There, the record showed that "there was evidence tending to establish that the track scale box was not erected in a reasonably safe place." It also appeared that while the scale box in question stood $19\frac{1}{2}$ inches from the side of a passing box car, "there was evidence that at other yards than the one in question the distances from the side of a standard box car to adjoining scale boxes varied from 16 inches to 168 inches;" and this evidence became exceedingly important, inasmuch as the plaintiff testified that, while he knew the scale box was there, he had not, before the time of the accident, been on track No. 2, and did not know its relation to the track. It was sought to show that he was familiar with the construction of standard scale boxes in relation to railroad tracks, and the variation of the boxes in distance from the track became most important. But here the conditions as to the bridge girder, tracks, coupling appliances, and cars were as they had existed for "five or six years," and there was no defect shown or claimed, except that the garbage car was wider than the box car to which it was being coupled. There, all that plaintiff knew of the scale box was that it stood adjacent to track No. 2, but he had not been on this track or in the vicinity of the scale box before the night and trip of the accident. Here the plaintiff had seven years' experience and observation of existing con-

ditions behind him.    There plaintiff was hanging to a moving train in the performance of his duty, and where his duties required him to be. ' Here plaintiff was standing on the ground looking at a slowly approaching car, which he had set in motion, presumably, at most, but a few yards' distance from where he was standing, and, as we shall shortly demonstrate from his own record, he was in a position where he was not required to be in order to properly perform his duties.    In the light of this comparison, it requires a vivid and flexible imagination to bring the law applicable to the facts in that case into harmony with the facts in this case.

The other case cited and relied upon in the opinion of the court (*Texas & P. R. Co.* v. *Harvey,* 228 U. S. 319, 57 L. ed. 852, 33 Sup. Ct. Rep. 518) is not in point.    My associates seem to have overlooked the fact that on the question of assumed risk the case turned upon a local statute of Texas modifying the common-law rule.    The opinion also fails to disclose that the Supreme Court turned its decision on the question of contributory negligence.    There is a well-defined, but quite elementary, distinction between assumed risk and contributory negligence.

I have proceeded thus far in answer to the theory upon which my learned associates have reached their decision.    It, however, can be demonstrated clearly that the theory thus adopted is a false one, and that not only can no negligence be imputed to the railroad company, but that plaintiff was in a position at the time of the accident where he was not required to be by his employer, and where it was not necessary for him to be to perform the duty to which he had been assigned.    It is an elementary principle of the law of assumed risk that where an employee has two ways obviously open to him for the performance of a duty,—one safe, and the other dangerous,—if he elects to take the dangerous position, he assumes the risk attendant upon his selection.

Plaintiff had not only two, but three, ways open from which to choose.    He could have done as he testifies he did when he was ordered to go and make the coupling,—stand on the adjoining track and signal the engineer to move back the train.

When the coupling failed, he signaled the train forward a sufficient distance to permit him to go in and adjust the knuckle, and he could have stepped across the girder on to the adjoining track again before signaling the engineer to back up the train. He could have repeated this until the coupling was made. We must assume that this was a usual method of coupling, since plaintiff, when complying with the order of his superior in the first instance, adopted it. No witness has testified that it was not proper. On the contrary, the conductor in charge of the train at the time of the accident testified "that in making the couplings the men go in to where the cars stand, and set the couplings, and they can then either stay inside between the girder and the cars, or come out on to one of the other tracks, or they might climb out on top of the girder."

Plaintiff, on the other hand, had open to him the method which the testimony of his fellow employees conclusively shows to have been followed not only by other brakemen and switchmen, but by plaintiff himself,—to stand on top of the girder while the cars were coming together to effect a coupling. The conductor, as above quoted, testified that the men in making the coupling "might climb out on top of the girder," and, on cross-examination, "that he had quite frequently seen men on top of the girder when at work making coupling on the bridge." The engineer in charge of the engine when plaintiff was injured testified "that he had known Duvall as a railroad man for five or six years, ever since the high line had been operated, and the conditions of the line and the bridge had been the same during that time; that he sees men on top of the girder when they give signals about shifting, every time they couple cars; that he had seen Duvall on the girder, but could not remember whether he saw him on the girder on the day he was injured; and he has frequently seen brakemen stand on the girder during coupling operations, and nothing could reach them there." An extra brakeman testified "that he had seen men in making couplings on the bridge get up on top of the girder, and also had seen them stand between the car and the girder."

Thus it will be observed that three ways were open to plain-

· tiff, two of which, at least, were perfectly safe. Much is made in the opinion of his being required to operate the lever at the end of the car when the coupling was being made. He was not required to do so in the first instance when he stood on the adjoining track, and there is not even an intimation in the evidence that any such requirement existed. But if it did, the lever could have been operated as easily and as effectively from the top of the girder as from the ground. But it is asserted that others had coupled cars from the position assumed by plaintiff, and no accident had occurred; therefore he was justified in assuming that the place was safe. In other words, if six employees in the performance of a duty assigned them assume a careless, negligent, and unnecessary position, and escape injury, the employer would be liable for injury to the seventh because of the successful escape of the six. This illustrates the absurdity of the logic. If there was anything in the contention, the successful escape of the six would justify the employer in assuming that the place was safe. But the reasoning reaches neither the employer, the employee, nor anyone else. We have plaintiff, with his eyes open, selecting a dangerous place to perform the duty assigned him, when a safe place was but a step away, and by his gross negligence inviting injury. If, as urged, the width and height of the garbage car made the place dangerous, the danger was so apparent that, in the exercise of reasonable care, he ought to have observed it. His gross carelessness in this particular is not an open question.

Plaintiff has tendered no issue of fact for defendant to answer. While the jurors are the duly appointed triers of facts, and cases should not be withdrawn from their consideration except for good cause, the court should not permit them, in disregard of all rules of legal procedure, to indulge in mere speculation and reach a verdict induced by sympathy or prejudice. Where the testimony submitted can legally lead to but one result, there is no question for the jury, and the judge, in the proper discharge of his duty, should withhold the case. "The judge is primarily responsible for the just outcome of

the trial. He is not a mere moderator of a town meeting. submitting questions to the jury for determination, nor simply ruling on the admissibility of testimony, but one who, in our jurisprudence, stands charged with full responsibility. He has the same opportunity that jurors have for seeing the witnesses, for noting all those matters in a trial not capable of record, and when, in his deliberate opinion, there is no excuse for a verdict save in favor of one party, and he so rules by instructions to that effect, an appellate court will pay large respect to his judgment." *Patton* v. *Texas & P. R. Co.* 179 U. S. 658, 45 L. ed. 361, 21 Sup. Ct. Rep. 275.

Commenting upon the wide and extensive scope of judicial discretion, Mr. Justice Robb, in *Capital Traction Co.* v. *Brown,* 29 App. D. C. 473, 12 L.R.A.(N.S.) 831, 10 Ann. Cas. 813, taking judicial cognizance of the negligence of the railway company, said: "Their dereliction in failing to provide adequate accommodations for their passengers is so generally known that courts will take notice of it, for, while theoretically justice is blind, practically justice is ever alert, watchful, and progressive." On plaintiff's own testimony justice must be more than theoretically blind; its eyesight is woefully defective when it fails to observe the approaching garbage car. Even excusing plaintiff's presence in the place where he was injured, the situation depicted by the record is so obvious that whether plaintiff ought to have observed it is a question of law for the court, and not a question of fact for a jury.

As stated at bar and in brief of counsel, this case was instituted in the belief that the defense of assumed risk had been denied defendant in the employers' liability act. But in *Seaboard Air Line R. Co.* v. *Horton,* 233 U. S. 492, 58 L. ed. 1062, L.R.A.1915C, 1, 34 Sup. Ct. Rep. 635, Ann. Cas. 1915B, 475, the court held that the act had left the common-law doctrine of assumed risk intact. What Congress refused to do, however, has been effectually accomplished in this District by the opinion in this case. A precedent has been established which will lead to increased litigation in a branch of the law already overworked in this jurisdiction. Whatever conclusion a jury, specu-

lating in the realm of sympathy and prejudice, may reach in this case, there remains but one legal and just judgment,— that reached by the learned trial justice, which should be affirmed.